UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

CHRISTOPHER PAIGE,

Defendant.

**DECISION
and
ORDER**

-----------------------------

**REPORT
and
RECOMMENDATION**

**06-CR-355A(F)**

APPEARANCES:        TERRANCE P. FLYNN
                    UNITED STATES ATTORNEY
                    Attorney for the Government
                    RICHARD P. MAIGRET
                    Assistant United States Attorney, of Counsel
                    Federal Centre
                    138 Delaware Avenue
                    Buffalo, New York  14202

                    JOSEPH B. MISTRETT
                    FEDERAL PUBLIC DEFENDER
                    Attorney for Defendant
                    JOHN F. HUMANN
                    Senior Litigator, of Counsel
                    300 Pearl Street, Suite 450
                    Buffalo, New York  14202

## JURISDICTION

This case was referred to the undersigned by the Hon. Richard J. Arcara on

November 15, 2006 for all pretrial matters.  (Doc. No. 10).  The matter is presently

before the court on Defendant's motion to suppress evidence and for non-dispositive

relief (Doc. No. 9) ("Defendant's motion").[1]

---

[1]  Because Defendant's motion seeks both dispositive and nondispositive relief, the court addresses all issues in this combined Decision and Order and Report and Recommendation in the interest of efficiency.

## BACKGROUND

On October 18, 2006, Defendant Christopher Paige ("Defendant") was indicted with unlawful, knowing possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (Doc. No. 6).  Defendant's motion was filed on November 13, 2006.  (Doc. No. 9).  The Government filed its response to Defendant's motion on December 6, 2006.  ("Government Response") (Doc. No. 11).  Buffalo Police Officers Kevin Biggs, Stephen Schulz and Buffalo Police Detectives Christopher Kochersberger, Patrick O'Rourke and Daniel Rinaldo testified at an evidentiary hearing before the undersigned on December 11, 2006.  (Doc. No. 12).  Defendant did not testify.  Defendant submitted his Post-Hearing Memorandum of Law on February 12, 2007.  ("Defendant's Memorandum") (Doc. No. 18).  The Government filed its Memorandum of Law ("Government's Memorandum") on March 5, 2007.  (Doc. No. 22).  On March 12, 2007, Defendant filed his Reply Memorandum to the Government's Memorandum.  ("Defendant's Reply Memorandum") (Doc. No. 23).  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for non-dispositive relief is GRANTED in part, and DISMISSED, in part, as moot, and Defendant's motion to suppress should be GRANTED in part, and DENIED in part.

## FACTS [2]

The charges in the Indictment arise from evidence, a firearm, obtained by Buffalo

---

[2] Taken from the pleadings and papers filed in this proceeding.

police officers during a warrantless entry and search of an apartment where the

Defendant resided ("Defendant's apartment," or "the apartment"), at 531 West Utica

Street in Buffalo, New York ("531 West Utica").  On July 4, 2006, at approximately

11:23 P.M., Buffalo Police responded to a 911 call reporting a person had been stabbed

near 81 Brayton Street ("81 Brayton"), which is around the corner from 531 West Utica.

Tr. at  3, 83.[3]  Buffalo Police Officer Stephen Schulz ("Officer Schulz" or "Schulz")

arrived at 81 Brayton at 11:24 P.M., where the stabbing victim was found on the street.

Tr. at  112, 116.  At 11:36 P.M., the Buffalo Police Department's homicide unit was

informed that the victim had been taken to a local hospital where he expired at 11:54

P.M..  Tr. at 81, 112.

Meanwhile, after arriving at 81 Brayton, Buffalo Police Officer Kevin Biggs

("Officer Biggs" or "Biggs") received a phone call from an informant ("the informant"),

whom Biggs had known for several years, and who observed the activity near 531 West

Utica prior to the 911 call and discovery of the victim.  Tr. at 5, 21.  Specifically, the

informant told Biggs that an altercation took place in front of 531 West Utica, which is

around the corner from 81 Brayton, and approximately 75 to 100 feet away from 81

Brayton, Tr. at 5, 83, 104, that the participants in the fight had dispersed, Tr. at 6, that

the informant saw the victim whom the informant was unaware had been stabbed, walk

around the corner toward 81 Brayton, and that, once the persons involved in the

altercation began to disperse, Defendant, who lives at 531 West Utica, began throwing

bicycles, that the participants in the fight had been riding, against the side of his

---

[3]  "Tr." references are to pages of the hearing transcript of an evidentiary hearing conducted on
December 11, 2006, filed in this case.

building "in a frantic manner," but had then left the scene.  Tr. at  5, 22, 26-27, 41.

Because the informant was then unaware that a stabbing had occurred, Tr. at 26, a fact

reported by the 911 caller, the 911 caller and the informant were two different people.

Tr. at  27-28, 88-90, 95-96.  The informant did not observe any participant in the

altercation enter 531 West Utica at any time during or after the fight.  Tr. at  27.  The

victim's identity was unknown to the informant, Tr. at  28; however, the informant knew

Defendant's first name.  Tr. at   27.  The informant was not identified at the hearing

because the informant and informant's wife had been photographing Defendant's

alleged drug sales from 531 West Utica for the last four to five months.  Tr. at 24-25.

Officer Schulz testified he also knew of prior complaints of drug activity near 531

West Utica.  Tr. at  120.  Although Schulz was aware that drug activity often involved

the use of illegal weapons, Schulz did not inform the other officers involved in the

investigation of the drug trafficking complaints because Schulz did not think it was

important to do so.  Tr. at  124-26.  Though he had seen the photographs taken by the

informant, Officer Biggs testified he could neither confirm nor deny that the activity

depicted in the photographs was drug related.  Tr. at  24-25.  Biggs found no knife,

bloody clothing, or blood on the sidewalk leading from 531 West Utica toward 81

Brayton or on the steps outside 531 West Utica, and no injured person was found by

investigators at or near 531 West Utica.  Tr. at  48.  Approximately five minutes after

Biggs's arrival, Buffalo Police Detective Sergeant Daniel Rinaldo ("Detective Rinaldo" or

"Rinaldo") arrived on the scene at about 11:40 P.M.  Tr. at  43, 81.  Biggs, who had been

posting the area with yellow crime tape prior to Rinaldo's arrival, contacted the

informant by telephone so Rinaldo could speak directly with the informant.  Tr. at  9, 44.

The informant told Rinaldo that the assault occurred outside of 531 West Utica and involved many individuals who were on bicycles and "at least one victim."  Tr. at  103.

Detective Rinaldo, who, as senior officer on the scene, directed the entry of 531 West Utica, testified that he had no prior knowledge of drug activity at 531 West Utica.  Tr. at  104.  However, according to Rinaldo, the presence of the bicycles near the crime scene corroborated the informant's statement that several persons were involved in the altercation.  *Id.*  Based on Rinaldo's conversation with the informant, Rinaldo's observation of the crime scene, Tr. at  81, the absence of light in Defendant's apartment, that a TV inside the apartment was left on, and that the front door to the apartment was ajar and that 531 West Utica was in a high crime area, Rinaldo concluded that another seriously injured victim might be inside the apartment and in need of assistance.  Tr. at  103, 111.

Rinaldo therefore decided that he and officers Schulz and Biggs should enter 531 West Utica to search inside the apartment for possible other victims of the assault because "we're going to look stupid" if the officers failed to investigate for other victims.  Tr. at  61, 117-18.[4]  Biggs and Schulz also testified that their reason for entering 531 West Utica was to search for potential victims. Tr. at  15, 119.  According to Biggs, Defendant's act of throwing bicycles, including one owned by the victim, against the side of the building at 531 West Utica as the informant related to him, shortly after a stabbing, constituted suspicious behavior by Defendant's involvement in the fight.  Tr. at  15.  Prior to the entry, Biggs believed the stabbing occurred during the fight.  Tr. at 15-

---

[4]  Rinaldo testified he feared the officers would look like "assholes," if another "victim was inside this apartment," and the officers had failed to "clear" it.  Tr. at 90-91.

16.  At this point, based on the informant's identification of Defendant, as the occupant

of the apartment, Defendant was considered as a prospective witness but not a suspect

in the stabbing.  Tr. at  30.

Rinaldo knocked on the apartment door and yelled "police," but receiving no

response, the officers proceeded to enter the apartment.  Tr. at  118.  Inside, while

providing "cover" for the other two officers, Biggs "bumped" into an open drawer of a

small table in which Biggs saw a gun.  Tr. at  12-13, 119.  Biggs yelled "gun" to make

Schulz and Rinaldo aware that Biggs had discovered a weapon in the apartment.  Tr. at

14, 119.  Upon discovering the gun, during the "30 seconds" needed "to clear" the

apartment, Tr. at 16, and as no victims were located in the apartment, the investigators'

focus shifted to determining ownership of the firearm.  Tr. at  128.  While searching the

apartment for evidence of the weapon's owner, the officers found a plate with 10 bags

of crack on it behind a closed cupboard door, Tr. at  128, and a wallet containing

documents identifying Defendant.  Tr. at 32, 120, 128.

As a result of the search, Biggs requested a warrant for Defendant's arrest on

state firearms (felon-in-possession of a firearm) violations; however, the warrant was

not promptly obtained, Tr. at  131, and, as a consequence, Biggs effected a warrantless

arrest of Defendant several days later, on July 8, 2006, Tr. at  131-32, outside of

Defendant's apartment.  Tr. at  20.  At that time, Defendant asked Biggs why he was

being arrested to which Biggs responded that Defendant was being arrested for criminal

possession of a "weapon" the officers had previously found in Defendant's apartment.

*Id.*  Without questioning by Biggs, Defendant stated, "I don't know nothing about that

gun, that must have been my cousin's [*sic*]."  *Id.*  Prior to Defendant's remark, Biggs

6

had not told Defendant the "weapon" seized from Defendant's apartment was a gun. Tr. at  21.

Following his arrest, Defendant was taken to a police station, where Defendant was given his *Miranda* warnings by Officer Kochersberger.  Tr. at  134, 136-38. According to the officers present, Defendant was asked if he understood his rights, and Defendant indicated he did.[5]  Tr. at  148-50.  After about 10 to 15 minutes, Tr. at 152, while still handcuffed at the police station but without questioning by police, Defendant spontaneously stated, "[h]ow are you all going to charge me with the gun and them drugs if I wasn't even in the house when you all went in there and you didn't have any probable cause to be up in my place," and "I don't know nothing about that gun.  The gun was Wayne's."  Tr. at  135, 151-53.  Following these statements, Defendant was turned over to homicide detectives presumably for questioning regarding the stabbing.[6] Tr. at  153.

## DISCUSSION

## I.    Motion for Discovery

Defendant moves for discovery and copies of radio transmissions regarding entry into 531 West Utica and seizure of the gun and ammunition inside the apartment pursuant to Fed.R.Crim.P. 16 ("Rule 16").  Defendant's Motion ¶¶ 10-11.  The

---

[5]  Although the testimony on whether Defendant manifested that he understood the warnings lacks precision on this question, Defendant does not contend otherwise.

[6]  Defendant was subsequently charged with state weapons possession, narcotics and false identification violations, Defendant's Exhibit 1; however, the record indicates Defendant was not charged in connection with the fatal stabbing.  Tr. at 16 (stabbing occurred in front of 531 West Utica according to "confession from the murderer."), 47 (Defendant was not charged with the stabbing).

Government responded that, as of November 3, 2006, it had provided Defendant with all Rule 16 discovery material except one laboratory report which it agreed to provide to Defendant.  Government's Response at 3.  As such, Defendant's request for Rule 16 discovery is DISMISSED as moot.  However, as the Government does not oppose Defendant's request for copies of radio transmissions regarding the entry of 531 West Utica, Defendant's request for copies of the relevant radio transmissions is GRANTED. The Government shall provide such material to Defendant **no later than 30 days** prior to the commencement of trial, or any other date, as the District Judge may direct.

## II.     Defendant's Motion to Suppress

Defendant moves to suppress the gun and, as the gun was loaded, Tr. at 126, the ammunition obtained by police from 531 West Utica and any statements made by Defendant following his arrest as the fruit of an illegal search.  Defendant's Motion ¶¶ 4-9.  Specifically, Defendant maintains that the officers were not constitutionally permitted to search Defendant's apartment without a warrant because the search was not justified by exigent circumstances to provide emergency assistance to a victim of the fight, and therefore constituted an unreasonable search and seizure.  Defendant's Memorandum at 2-20.  In opposition, the Government contends that the officers had an objectively reasonable belief that exigent circumstances were present and, as such, their warrantless entry and seizure of the firearm, which the Government contends was in plain view, was constitutional.  Government's Memorandum at 8; 12.  The Government also maintains that the administration of *Miranda* warnings to Defendant eliminates any taint potentially related to the warrantless entry that could conceivably attach to

Defendants statements.  *Id.* at 21.

The  Government relies upon several factors, established by *Dorman v. United States,* 435 F.2d 385, 392-93 (D.C. Cir. 1970) and later adopted by the Second Circuit, *see United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir. 1990) ("We have adopted the factors set out in *Dorman,* 495 F.2d at 392-93, as guideposts intended to facilitate the district court's determination."), *cert. denied,* 498 U.S. 1119 (1991), to establish the presence of exigent circumstances in the instant case.  Government's Memorandum at 12-15.  However, based on the record, the court finds *Dorman* inapposite because at issue in *Dorman* was a warrantless entry of a residence to arrest a suspected felon, *Dorman, supra,* at 390, and the testimony in the instant case unambiguously demonstrates that the sole reason asserted by the officers for entering 531 West Utica was to aid potentially injured victims.  Tr. at  61 (Rinaldo), 119 (Schulz), 15 (Biggs). Therefore, the correct analysis as to the legality of the warrantless entry into Defendant's apartment should be based on caselaw applicable to whether exigent circumstances to aid an injured victim were present.

## A.    The Officers' Warrantless Entry

The Fourth Amendment, as relevant, protects the right of the people to be secure in their houses and effects against unreasonable searches and seizures. *Arizona v. Evans,* 514 U.S. 1,10 (1995).  Generally, a warrant is required before a search and seizure may be conducted, unless an exception to the Fourth Amendment's warrant requirement exists.  *Arizona v. Hicks,* 480 U.S. 321, 326 (1987) (recognizing exigent circumstance exception to warrant requirement).  One well-established exception to the warrant requirement is the exigent circumstances exception,

*MacDonald,* 916 F.2d at 769, which permits law enforcement to enter a home without a warrant to provide assistance, or effect a search or seizure under specified conditions. *Id.*

"[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart,* 126 S.Ct. 1943, 1947 (2006) (citing cases); *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) ("'[P]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance.'") (quoting *Root v. Gauper*, 438 F.2d 361, 364 (8th Cir. 1971)). "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an <u>urgent need</u> to render aid or take action." *Anthony v. City of New York,* 339 F.3d 129, 135 (2d Cir. 2003) (underlining added).

A  warrantless entry to assist a victim is justified if, based on the totality of the circumstances known to the investigating officers at the time of entry, it was objectively reasonable for the officer to enter without a warrant. *Tierney*, 133 F.3d 189, 196 (citing *Mincey v. Arizona,* 437 U.S. 385, 392 (1978)). It is the government's "heavy burden" to establish the presence of an exception to the warrant requirement. *Welsh v. Wisconsin,* 466 U.S. 740, 750 (1984); *see also United States v. Arboleda,* 633 F.2d 985, 993 (2d Cir. 1980), *cert. denied,* 450 U.S. 917 (1981).

The Government contends that the officers' warrantless entry was justified by exigent circumstances based on the need to locate and assist potential victims of the earlier altercation in front of Defendant's apartment, and that, given the "totality of the

circumstances," the officers "had a strong, reasonable suspicion to believe that another

victim of the melee . . ., was currently inside the premises . . . and in need of medical

attention."  Government's Memorandum at 13-14.  However, the record establishes

otherwise.  Specifically, although the officers were investigating a violent altercation and

related stabbing which occurred near Defendant's apartment, no evidence connected

the sole stabbing victim, found in front of 81 Brayton some distance from Defendant's

apartment, or any other participant in the altercation, to Defendant's apartment or to

Defendant as the assailant.  In fact, as noted, at the time of the entry, Defendant was

not suspected of the stabbing and another person later confessed to the homicide.  Tr.

at 16, 30.  Rather, the evidence available to the police prior to their entry establishing

the victim was stabbed, during the altercation, which started in front of Defendant's

apartment, the fact that no one saw any potential victim enter the apartment, the

absence of blood stains on the street or sidewalk between 81 Brayton and Defendant's

apartment, the failure by officers Schulz and Biggs to effect an immediate entry of the

apartment to locate and assist potential victims, and the continuation of the search

inside the apartment after the officers ascertained no victim was present in the

apartment, support the conclusion that exigent circumstances to aid a victim were not

present, and that the officers' warrantless entry was based on mere surmise, not

objective facts reasonably suggesting that an actual emergency involving human safety

then existed in Defendant's apartment.  As such, the officers' warrantless entry of the

apartment after Detective Rinaldo's arrival was unreasonable and prohibited by the

Fourth Amendment.

     The Government maintains the officers' decision to enter was based on their

knowledge that a violent altercation had occurred in front of Defendant's apartment approximately one-half hour earlier, that at least one person may have received serious stab wounds during the altercation, that Defendant, who resided at 531 West Utica, was involved in the fight, that 531 West Utica was located in a high crime area, that the door to the apartment was "open a couple of inches," Tr. at 10, that Detective Rinaldo received no response when he knocked loudly on the front door of the apartment for 20 to 30 seconds announcing the police were present, that a television at high volume level was on and that no lights were on inside the apartment. Government's Memorandum at 11.  However, such factors do not reasonably demonstrate that the police were confronting an emergency situation as Detective Rinaldo himself acknowledged these factors might be present in "a thousand scenarios," Tr. at  111, and further conceded that the fact that the door to an apartment located in a high crime area was ajar "wouldn't prompt me necessarily to believe that there was a victim inside, but I felt it was very unusual."[7]  Tr. at  86.  Further, Officer Biggs testified that, prior to the entry, Detective Rinaldo explained to Biggs and Schulz the reason the officers should enter the apartment to look for other potential victims was so that the officers would not look "stupid" if one or more injured persons were then inside and the officers had failed to find and aid such victim.  Tr. at  61.

Contrary to the Government's contention, nothing in the record suggests that Rinaldo's arrival and determination of an exigency established a reasonable prerequisite to an entry for emergency purposes.  Any belief by the officers that other

---

[7]  The door being "ajar" was a significant fact as Rinaldo conceded that had the door been "closed and locked" he would have consulted a prosecutor as to the need for a search warrant to authorize the entry.  Tr. at 93.

potential victims were inside the apartment and in need of aid for serious injuries received during the earlier altercation is strongly negated by the fact that neither Officer Schulz, who was the first officer to arrive at the scene, nor Officer Biggs, who spoke with the informant prior to Rinaldo's arrival and was, like Schulz, aware of the stabbing as well as the prior altercation in front of Defendant's apartment, believed it was necessary to effect a warrantless entry of the apartment to assist possible victims.  *See Root, supra*, at 365 (town marshal's delay of "several minutes" before warrantless entry inconsistent with belief "that wounded persons" were then "inside house awaiting attention.")  Indeed, rather than effecting an immediate entry into the apartment prior to Rinaldo's arrival at the scene, to search for other potential victims, Biggs was engaged in placing yellow crime scene tape around the area.  Tr. at  5-6, 9, 44.  Thus, it was not until Rinaldo decided to enter the apartment, approximately 15 to 20 minutes after Schulz first arrived at the scene, Tr. at  43, 61, 81, 117-18, that any need to enter Defendant's apartment occurred to either Schulz or Biggs, who then possessed the same information as Rinaldo, to locate and assist a potential victim in Defendant's apartment.  Rinaldo's effort, by shouting "police," to make contact with someone inside the apartment does not excuse the officers' delayed entry as there was no indication up to that point that someone in the apartment was in need of assistance.  *See United States v. Jones*, 635 F.2d 1357, 1382 (8th Cir. 1980) (delayed entry after reasonable attempt to ascertain whether danger had dissipated did not vitiate need for exigent entry).

Even if the officers subjectively believed that another victim could be inside the apartment, such a belief was not, on this record objectively reasonable, as required.

*Tierney*, 133 F.3d at 196.  No information received by the officers from the informant or

from any other source in any way suggested that a participant in the fight was observed

to enter 531 West Utica during or after the altercation.  Tr. at  27.  In fact, there was no

indication that Defendant himself had ever entered the apartment after the altercation

as the informant reported only that Defendant was observed throwing bicycles against

the building after the fight, Tr. at  5, 26-27, but had then left the scene.  Tr. at 22, 41.

Moreover, contrary to the officers' testimony on this key issue, in a contemporaneous

report, filed the day after the incident, Tr. at 79, Biggs stated that the firearm had been

"[r]ecovered in plain view while a cursory search of apartment for homicide suspect

[*sic*]."  Tr. at 60 (referring to Defendant's Exhibit 5).  Despite Biggs's inadequate attempt

to repudiate the statement as a "stupid error," Tr. at 79, the statement significantly

undermines the Government's premise that the primary purpose for the entry was to

assist an injured victim of the fight, not to investigate the crime for which the officers

were called to the scene.  Nor did the officers detect any signs of foul play such as cries

for help or other expressions of injury from inside the apartment by a person needing

emergency assistance.  *See Root*, 438 F.2d 361, 364 (recognizing exigent

circumstances for warrantless entry "'where the officers, passing by the street hear a

shot and a cry for help and demand entrance'") (quoting *McDonald v. United States*,

335 U.S. 451, 454 (1948)).  Thus, even though the altercation had occurred outside

Defendant's apartment, and, as the informant reported to Biggs, an apparently injured

person, the stabbing victim, was seen walking away from the altercation in the direction

of 81 Brayton, 75-150 feet from 531 West Utica, Tr. at  26, no evidence of which the

officers were made aware prior to the entry indicated there was any nexus between the

14

stabbing and the interior of Defendant's apartment.

Additionally, the informant, who had observed the altercation, did not tell the officers that someone was stabbed during the altercation, as although, according to the informant, the victim had "stumbled" around the corner after the fight, Tr. at 16, the informant was not aware there had been a stabbing. Tr. at  26.  Further, as noted, no blood was discovered between the point where the victim was found near 81 Brayton and  in front of 531 West Utica where the altercation allegedly occurred.  Tr. at  48. That Defendant was seen by the informant throwing bicycles against the house at 531 West Utica does not reasonably imply another victim was then within Defendant's apartment in need of medical assistance.  Thus, the officers had no basis to tie the prior assault itself to Defendant's apartment, and no objective facts reasonably supported the existence of an "urgent need," *Anthony,* 339 F.3d at 135, to enter Defendant's apartment to aid a potential victim.  *Id.* at 135-36 (exigent circumstances justified warrantless entry where call was placed from location by caller reporting imminent, deadly threat of harm to herself); *Tierney,* 133 F.3d at 197 (officer, responding to "bad" domestic heard no noise in the house upon arrival but found broken window pane, was told by observers this was "the worst yet," and informed by neighbors screaming from inside house ceased just prior to officer's arrival, had reasonable belief that exigent circumstances were present).  *See also Root, supra,* at 365 (knowledge that victim had been removed from premises by medical personnel and no other victims found negated grounds for delayed warrantless entry by police).  Therefore, in this case, no information possessed by the officers objectively supported a reasonable belief that other victims who may have been injured during the altercation would be inside

15

Defendant's apartment and in need of emergency assistance necessitating the officers' warrantless entry.[8]

Finally, as discussed, Discussion, *supra*, at 11, while the officers maintained their sole purpose for the entry was to aid a possible victim, the continuation of their search of the apartment, after quickly learning no victim was present, strongly suggests the officers' motivation was primarily to solve a crime – the stabbing – not to save a life.  As discussed, Discussion, *supra*, at 14, Biggs's contemporaneous report that the officers were in fact searching for a suspect in the stabbing taken together with the extensiveness of the search after quickly failing, within 30 seconds, to locate any victims bolsters the court's finding that the actual motive for the entry was investigatory, not to render emergency assistance.  Significantly, the officers admitted they were motivated primarily by a desire to avoid being professionally 'second-guessed' after the fact as Detective Rinaldo directed the entry was so that the officers would not later appear to have been "stupid" if a second victim somehow was inside.  Tr. at 61.  As such, the Government has failed to meet its "heavy burden," *Welsh*, 466 U.S. at 750, as to the existence of a need for an emergency warrantless entry, and the Defendant's motion should be GRANTED on this ground.

### B.    Objects in Plain View

The Government alternatively contends that the officers' seizure of the firearm from Defendant's apartment was permissible pursuant to the plain view doctrine.

---

[8]  Although Biggs was aware of prior alleged drug activity at the apartment, the Government does not rely on an exigent need to preserve evidence of this crime, conceding that after determining no victim needed assistance, the officers' subsequent searching activity was beyond the scope of the exigent circumstance justification.  Government's Memorandum at 17.

Government's Memorandum at 8.  The plain view doctrine is a well-established exception to the Fourth Amendment's warrant requirement.  *Ruggiero v. Krzeminski,* 928 F.2d 558, 561 (2d Cir. 1991).  However, to qualify a seizure based upon the plain view doctrine, "the initial intrusion by the police officer must be lawful so that he can justify being in a position to make his [plainview] discovery."  *Ruggiero, supra,* at 561 (quoting *United States v. Moreno,* 897 F.2d 26, 32 (2d Cir.) (citations omitted), *cert. denied,* 497 U.S. 1009 (1990)).  To withstand suppression, however, a police officer's access to the object seized in plain view is required have been permitted under the Fourth Amendment and therefore the officer must also have had "probable cause to suspect that the item [was] connected with criminal activity."  *United States v. Gamble,* 388 F.3d 74, 75 (2d Cir. 2004) (citing *United States v. Martin,* 157 F.3d 46, 54 (2d Cir. 1998) (quoting *Illinois v. Andreas,* 463 U.S. 765, 771 (1983))).  *See also Hicks*, 480 U.S. at 326 (probable cause to believe item to be seized in plain view constitutes evidence of crime is required).

Here, as discussed, Discussion*, supra,* at 10-16, it was not objectively reasonable for the investigating officers to believe exigent circumstances, constituting an emergency involving human life, were present to justify the warrantless entry of Defendant's apartment.  Nor did the officers have any reason to believe the discovered firearm constituted contraband or evidence of a crime, as no testimony was proffered to support such a conclusion.  *See Gamble, supra* (seizure of item in plain view requires probable case to believe item is evidence of a crime); *see also Hicks, supra*, at 136 (not to require probable cause that item to be seized under plain-view doctrine be evidence of crime "would be to cut the 'plain view' doctrine loose from its theoretical and practical moorings.")  Thus, because the officers' warrantless entry violated the Fourth

Amendment, even if the subsequently seized evidence was in plain view when Biggs bumped into the table shortly after entering the apartment, as the warrantless entry was not justified by the emergency entry exception to the warrant requirement, the officers were not lawfully in a position to make a plain view discovery of the weapon and, in any event, lacked any knowledge that it was associated with, or constituted evidence of, a crime. *Ruggiero, supra*, at 461; *Gamble, supra*. As such, the plain view doctrine is inapplicable to this case and cannot legitimize the warrantless seizure of the gun. Accordingly, the gun seized during the warrantless entry should be suppressed.

### C. Defendant's Statements as Fruit of the Poisonous Tree

As Defendant requests, the court also considers, whether Defendant's statements made to police, following his arrest, on July 8, 2006 must be suppressed as "fruit of the poisonous tree." Defendant's Motion at ¶¶ 8-9. The Government maintains that the administration of *Miranda* warnings to Defendant attenuated any initial illegality thus rendering Defendant's statements admissible. Government's Memorandum at 21. Although Defendant failed to provide legal support for his request, despite the Government's contention, the Supreme Court has held that the administration of *Miranda* warnings is only one, albeit "an important factor" to be considered in "determining whether the confession is obtained by exploitation of illegal arrest." *Brown v. Illinois,* 422 U.S. 590, 603 (1975).

Here, the preponderance of credible evidence shows that after Defendant was arrested, and prior to receiving *Miranda* warnings at the local police station to which he was transported, Defendant asked Biggs the reasons for his arrest and was informed that it was based on the prior warrantless search of Defendant's apartment. Without

further questioning by Biggs, Defendant then made an oral statement impliedly admitting knowledge and constructive possession of the gun seized from the apartment.  Tr. at 20-21.  A short time later, while still in custody but after being given his *Miranda* warnings, Defendant again made spontaneous utterances without being questioned, challenging, on constitutional grounds, the warrantless entry, but nevertheless thereby implicating himself in the possession of the seized firearm.  Tr. at 135, 151-53.  Thus, even if Defendant's arrest was unlawful as an exploitation of the warrantless search at Defendant's apartment, because Defendant's statements were spontaneous and not statements made responsive to police questioning, the court finds that Defendant's unprompted incriminating utterances represent his voluntary decision to speak, demonstrating the statements resulted from "an act of free will," *Kaupp v. Texas*, 538 U.S. 626, 632-33 (2003) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)), sufficient to purge the primary taint of the unlawful entry and search of Defendant's apartment and his subsequent arrest based on the seizure of the gun, as the "fruit" of this initial illegality.[9]  Defendant does not contend otherwise, and does not argue that any of his statements were involuntary.  Accordingly, Defendant's motion to suppress his post-arrest statements should be DENIED.

---

[9]  If Defendant's statements had been in response to police questioning, the absence of other intervening factors sufficient to purge the taint of the unlawful search and Defendant's subsequent arrest, suppression of Defendant's statements could be required.  *See United States v. Breedlove,* 424 F.Supp.2d 379 387-88 (D.Conn. 2006) (statements made in response to interrogation within two hours of warrantless arrest constitute fruit of poisonous tree notwithstanding that *Miranda* warnings were administered absent other independent intervening factors sufficient to purge the taint of the initial illegal arrest) (citing cases).

**CONCLUSION**

Based on the foregoing, Defendant's motion for discovery is GRANTED in part,

and DISMISSED as moot in part; Defendant's motion to suppress should be GRANTED

in part, and DENIED in part.

                                        Respectfully submitted
                                  as to Defendant's motion to suppress,

                                        /s/ *Leslie G. Foschio*
                              _____
                                        LESLIE G. FOSCHIO
                              UNITED STATES MAGISTRATE JUDGE

SO ORDERED as to
Defendant's motion for discovery

        /s/ *Leslie G. Foschio*
_____
        LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated: May 11, 2007
        Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:       May 11, 2007
             Buffalo, New York